INTERNATIONAL TOOTH CROWN CO. v. HANKS DENTAL ASS'N.

(Circuit Court, S. D. New York. October 31, 1901.)

1. PATENTS—VALIDITY—USEFULNESS OF INVENTION.
    The degree of utility of a patented article does not affect the question of patentability, nor does the length of time it will last and continue useful, but, if it is useful at all, that is sufficient to sustain the patent.

2. SAME—ACTION AT LAW FOR INFRINGEMENT—EVIDENCE OF USEFULNESS OF INVENTION.
    In an action at law for the infringement of a patent, upon an issue as to the usefulness of the patented article as affecting the validity of

the patent, the jury may consider the fact that it has been used by de-fendant if they find that he has infringed.

**3. SAME—CONSTRUCTION—SUPPORT FOR ARTIFICIAL TEETH.**
The Low patent, No. 238,940, for improvements in dentistry, relating to a method of inserting and supporting artificial teeth, construed in a charge to the jury in an action at law for infringement.

**4. SAME—INFRINGEMENT—MEASURE OF DAMAGES.**
In fixing the damages for infringement of a patent, where it is shown that the patentee had an established license fee for practicing the in-vention, it will be taken as fixing the measure of damages, notwith-standing he may have accepted a smaller sum in settlement with licensees who were in arrears, or made a reduction therefrom, where license fees for a long term were paid in advance.

Action at Law for Infringement of Patent.

Walter D. Edmonds, for plaintiff.

Charles K. Offield, for defendant.

LACOMBE, Circuit Judge (charging jury). It is a very mistaken system of jurisprudence that leaves the decision of the issues of fact that arise in a patent case to a jury. In the very nature of things, it is extremely awkward and difficult, and many times practically im-possible, for 12 laymen, untrained in the examination of the intricate questions which so frequently arise in patent causes, without any facilities for taking notes, and with no opportunity for the lengthened reflection which is frequently necessary to reach a wise conclusion in cases of this kind,—I say it is many times practically impossible for them to dispose of such questions. Nevertheless the law does allow the trial of these issues by a jury, and we have one to try here. It very rarely happens. I have sat on the bench for 15 years, and this is the first patent cause that I have tried with a jury. But, very for-tunately for you and for the interests of the litigants in this case, the patent before you is quite a simple one,—easy to understand,—and the issues presented are easy of comprehension, and may be pre-sented to you, I think, sufficiently well for you to understand them, and perhaps will not give you much trouble.

In order to show what questions of fact come before you, how much you have to do with the case, and how much the court has to do with the case, let me call your attention briefly to what a patent is. It is the policy of the law in this country, and had been enacted by congress, under the powers given to it by the constitution, that if a man finds out something new and useful,—a machine or combination or process or what not, something new and useful,—and publishes it to the world through the intermediation of the patent office, he shall in exchange for it, and as compensation for doing so, receive a patent; that is, he receives a grant of a monopoly of manufacturing, selling, and using that particular invention for a certain period of time,—17 years. That monopoly is not a monopoly in the sense in which the word first came into the English language, where, without anything at all except the mere whim of the sovereign power, some extraordinary privileges were given to individuals. The man who holds a patent monopoly has earned the right to the monopoly, be-cause he need not have invented the novelty unless he chose, and

having invented it he might have kept it to himself if he chose, and his fellow citizens and the community at large would be without the benefit of his discovery. Therefore there is nothing obnoxious to law or good morals or to anything else in the fact that a patent secures to the holder of it a monopoly for a limited period of time. That monopoly is secured to the individual by a document which is issued by the government, and is called "Letters Patent,"—a written document, that is, a printed document, accompanied generally with diagrams,—and in the document it is stated specifically what the invention is, and what it seeks to accomplish, how it is constructed, and how it works; and also there is set forth what exactly it is that the patentee claims to have been his new and useful discovery or invention which he wishes to retain the monopoly of, and which the department, by issuing the printed document, says he shall have a monopoly of. Just exactly what that document means—what invention it is which it secures as a monopoly to the individual—is a question of law for the court, and one with which the jury has nothing to do; and therefore, when we come to that stage of the case, it will be my duty not to give you this written document, to try and make out from it what it means, but to tell you as tersely and succinctly as I can just what it is that is granted to the International Tooth Crown Company, which is the assignee of the original patentee. When you are instructed as to what that patent means, the question of fact for you to determine will be whether what the defendant has done is an infringement of that patent; in other words, whether what the defendant has done is really the practicing of the invention which is disclosed by the patent. But, before we come to that question of fact, there are two other questions of fact which have got to be decided and passed upon by you. The statute provides that patents shall be given for new and useful inventions. Whether an invention is a new one or not is a question of fact; whether the invention is a useful one or not is a question of fact; and both those questions have to be decided by the jury. The question whether it is a new invention—whether it is novel—divides into two branches. In the first place, was it anticipated,—that is, was the same thing done or known before? and, secondly, if exactly the same thing was not known before, nevertheless were there other devices known to the public, known in the art, so near this that it needed no inventive skill, no inventive ability, to make the improvement of the patent, but that any mere workman possessed of the ordinary skill of the handicraftsman in that particular art would naturally have made the changes or improvements himself on the existing structure?

As to the first branch, whether this was new in the sense that nothing just like it ever existed before,—in other words, that it was not anticipated,—I can relieve you from any trouble, because there is no testimony here which shows what is known to the patent law as "anticipation." This device shown in the Low patent, and claimed by him, did not exist, so far as this testimony shows, before he came upon the scene. It is contended by the other side that, although that be so, nevertheless there were other devices, such as the Bing patent, or Bing bridge, known to the art, and that any workman, with the

ordinary skill of his calling, would have known enough to make changes or modifications in them which would have secured this very Low device. In other words, that in finding out, devising, this concededly novel—because it was not anticipated—invention, Low did not really exhibit the skill of an inventor, and therefore there is no patentable invention in the device. That is the claim of the defendant. That question is a very unfortunate question ever to have to submit to a jury. For years the intellects of jurists, trained by successive examination of repeated cases, many of them each year, bearing upon this general matter of patents, have been sharpened in an endeavor to lay down some satisfactory definition as to what is and what is not patentable invention; and so far as my reading goes, and so far as my own judgment goes, I have not yet read any definition which is entirely satisfactory to me, and the best that can be said is that it has to be left as a question in each particular case to be determined from the facts of that case; and barring some general principles to guide us, such as the fact or the circumstance that the new device went into general use after it was made known, which would indicate that it was sought for by the public and desired by the public, —and if it was desired by the public, and no one had found it before this man, the assumption may be that the other skilled workmen did not have the gift to devise it,—except, I repeat, for such broad generalities as that, there is very little that can be set up in the way of signposts for the guidance of a jury on the question of invention. It varies, of course, a great deal according to the character of the art in which the invention is alleged to have taken place. Upon this branch of the case all I can do is to leave the matter in your hands on the statements that we have had here as to what the former devices were, and on the statement which I shall give you when I come to charge you as to what this invention was. It may help you in reaching a conclusion to call your attention to the fact that the patent, before it was granted, went through the scrutiny of the officials in the patent office, and that the mere grant of a monopoly—the grant of a United States letters patent by the general government—carries with it the presumption that the invention is a novel one, and that presumption lasts and goes with the document wherever it is presented, until affirmative evidence introduced in opposition does away with the effect of the presumption. In other words, in this case the burden of proof is on the defendant to show you that although the patent office gave this document to Low, and through him to the plaintiff, as a conveyance of the monopoly, upon the theory that he had invented something new, nevertheless it was not novel. The burden, I say, is on the defendant to convince you of that fact before he can recover. I might also say that the province of the court and the jury is not quite so sharply differentiated in the federal courts as it is in the state courts, and our practice conforms more to that of the English court. I may, therefore, without impropriety say to you that if it were a question with which I were dealing, upon the facts in this case, I certainly would feel great hesitation, upon the evidence in this case, in reaching any conclusion which would overthrow the presumption which accompanies this grant from the beginning. Never-

theless, under the jurisprudence which prevails here, it is not for me to decide that question,—it is for you; and, although that may be my opinion, it is only my individual opinion, and must have no weight or influence with you. It is a question which you are to decide yourselves, upon the evidence, whether or not this invention of Low was such an advance over prior devices that he may fairly be said to have exhibited inventive genius in its discovery and disclosure. Upon that, in order that I may charge as much of the requests that have been handed to me, I will charge you that the quality of invention must reside and be found in this Low patent; that ordinary mechanical changes made by skilled mechanics, obviously called forth by new conditions, is not invention; and, if the jury find from the evidence an ordinary skilled dentist would have advanced beyond the device of the prior art to the device invented by Low, then the verdict of the jury would have to be for the defendant.

The other question of fact which comes before you to determine is the question of utility. The grant of the patent should be made only for a new and useful invention, and if the invention is useless the patent is void. Therefore it is for you to determine whether or not there is any utility in the invention. There has been a great conflict of testimony upon that point, as you remember, some coming forward and saying that it is highly useful and a great improvement in the art; others coming and saying it is worse than useless, that it is deleterious, and a very unfortunate thing to have anything to do with. You may be very much helped in disposing of all this testimony by one or two considerations. The first of them is that, if it is useful at all, that is sufficient. If there is any utility in it, that is sufficient to support the patent. The measure of utility does not make any difference. It would be a perfectly valid patent if a device is a useful one, although 50 or 100 others might be very much more useful, and although improvements upon the device might make it more useful than it was before. Nor is it necessary that a continuation of usefulness be shown, or that it must be so for a long period of time. That is not essential. If it is useful at all, it sufficiently meets the requirements of the statute that the invention must be a new and useful one to warrant the granting of the patent. On that point you may remember that Dr. Jarvie, one of the witnesses for the defendant, said it would not be useful but for a short time, and that Dr. Littig, another witness for the defendant, said it might last six months in some mouths. I also charge you, as requested by the defendant, that if you find from the evidence that the device or method of the Low patent in suit is without utility, and is not an improvement in the industry to which it relates, then your verdict must be for the defendant. · Finally, on this question of usefulness, one of the most important considerations in determining the question is the conduct of the defendant himself. If you find, in answering the other question in the case, as to infringement, that the defendant has used this invention, the testimony which he may introduce to show that the invention is a useless one is not likely to be supposed to have the same measure of weight that the same evidence would have if introduced by a person who did not use it. The mere circumstance

that the defendant chooses to use it seems to indicate that, from his point of view at least, it was a patentable invention.

As to the question of law in the case, let me instruct you exactly what it is that this patent conveys,—the exact measure of the monopoly. It is a method of inserting and supporting artificial teeth, which consists in attaching said artificial teeth to continuous bands, fitted and cemented to the adjoining teeth, whereby the artificial teeth are supported by the said permanent teeth without dependence upon the gum beneath. The artificial teeth are cut away at the back, so as to contact with the gum only along the front lower edge, and are supported by rigid attachment to the adjoining permanent teeth, and not at all by the gum. But the patented device is not restricted to any particular width of band, nor to any particular variety of band, nor to bands which do not turn over at the top. And the patent covers the connection of artificial crowns—crowns fitted upon natural roots, the crown spoken of here as the Richmond crown—by a bar or bridge bearing the artificial tooth or teeth. And it covers also a case where there is only one abutment, and the artificial tooth is hung on one only of the adjacent teeth. That is the invention which is subject to infringement, and the remaining question of fact for you to determine in the case will be whether or not the defendant infringed. What was done by the defendant has been stipulated in the case during the taking of the testimony, as to what work he did. It stands conceded before you that, to the extent of $2,080, the defendant did work which comes fairly within the description of the invention which I have just given to you. As to another sum ($520 worth of work) there arises, however, a question. The stipulation says that as to that $520 the bridge which bore the artificial teeth so carried them that they pressed down on the gum. As I have charged you with regard to the meaning of this patent, the teeth, in order to be within the patent, may contact with the gum, they may contact closely with the gum,—so closely, indeed, that no one could perceive, perhaps, that there was any space between them, or that it was possible to pass anything, water or what not, between them. But they, nevertheless, must not derive any of their support from the gum. If, therefore, from the testimony in this case, you reach the conclusion that although the teeth put in by the defendant in these cases, which amount to $520 worth, actually rested on the gum,—that is, actually touched the gum,—but did not receive support from it, then as to that $520 infringement also would be shown. If, however, you reach the conclusion from the evidence that in those cases the teeth not only touched the gum so as to make an apparent closing of all view-point between, but actually derived support from resting upon, the gum, then as to that $520 your verdict would have to be that there was no infringement.

If you reach the conclusion that there is infringement, it will only remain for you to settle the question of damages. The plaintiff claims that that is an easy matter for you, because he had a regular license rate fixed; and the testimony tends to show that there was a license charged by him at one time, and accepted under a license agreement by the defendant, of $25 for each year that the invention

was practiced, and 15 per cent. upon all money received for practicing the invention. There is some testimony brought in as to the fact that the plaintiff did not always receive, or did not always exact, that amount. It will be for you, from all the testimony in the case, to determine whether the plaintiff has fairly made out a case as to the $25 a year and 15 per cent. royalty, being the regular license fee that was charged. The mere circumstance that, after some infringer or some licensee had got way behindhand, and owed money for past obligations, both royalty and license, the plaintiff chose to accept some lump sum smaller than the license, in order to get the case settled, would not have a very material bearing on the question. Nor would it be of very material importance that in individual cases, where a man was willing to pay for five years in advance, some discount should be allowed for a payment of that sort. If you are satisfied from the evidence that the plaintiff had a regular license fee of $25 a year, and 15 per cent. royalty, then I charge you that as to the $2,080 the plaintiff would be entitled to recover $25 for each of the five years during which the invention was practiced, and 15 per cent. on $2,080. If, moreover, you reach the conclusion as to the $520, making the total amount $2,600, that it also was an infringement, the same application of license fee and royalty should be made. The license fee would not double, but the $25 license fee for practicing would cover practicing every variety of the invention.

Those are the questions, and the only questions, for you to pass upon. You are first to decide from the testimony whether there is any invention disclosed. If you reach the conclusion that there is no invention disclosed, then your verdict will be for the defendant. Then you are to determine whether the invention is a useful one. If you reach the conclusion that it is a useless invention, then your verdict will be for the defendant. If, on the contrary, you reach the conclusion that patentable novelty was displayed, and that a patentable invention was disclosed, and the invention was a useful one, then it will be for you to determine whether there is any infringement as to the $520. If you reach the conclusion that there is infringement as to the $520,—that is, in the case where the teeth are said to rest on the gum,—then you will cast 15 per cent. on $2,600, and will add to that five years' license fees, at $25 each, and give a verdict for that amount, with interest. If, on the contrary, you reach the conclusion that there was no infringement as to the $520, but you have found already that there was invention and usefulness in the patent, then you will cast your 15 per cent. on $2,080, and add to that five years' license fee, at $25, and for that sum, with interest, you will give your verdict. As to the amount of interest, the words "with interest" will be sufficient. It is a question of law as to what period the interest will run from in this case, and the court will fix the amount and the dates when your verdict comes in.

I will put down here on paper a few figures for you. They will be figures enough for you to take with you to enable you to reach a result: $2,080, infringements as charged; $520, infringements in dispute,—that is, as to whether or not the teeth resting on the gums.

are supported by the gums; the rate of royalty, 15 per cent.; license fee, $25 per annum; number of years, five.

Now, I will take any requests to charge. Except as charged, I decline to charge each and every one of the 11 requests submitted by the defendant, but do charge the request submitted this morning as the twelfth one, that the burden of proving infringement rests on the plaintiff.

The jury rendered the following verdict: For the plaintiff in the amount of 15 per cent. on $2,080, and five years' license fees, making a total of $437, with interest.

(November 16, 1901.)

I do not think this is a proper case for treble damages. A defense similarly prosecuted, after the questions raised in this action shall have been passed upon, if so passed upon favorably to complainant, might present a very different situation.