WISCONSIN PUBLIC SERVICE CORPORATION, Petitioner-Respondent-Petitioner,

and

MADISON GAS & ELECTRIC COMPANY, Wisconsin Electric Power Company, and Wisconsin Power & Light Company, Intervenors-Respondents-Petitioners,

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Appellant-Respondent.

Supreme Court

*No. 79–1929. Argued October 4, 1982.—Decided November 2, 1982.*

(Also reported in 325 N.W.2d 867.)

A joint brief was filed by *Steven E. Keane, Allen W. Williams, Jr., Trevor J. Will* and *Foley & Lardner,* Milwaukee, for Wisconsin Public Service Corporation and Wisconsin Electric Power Company; by *Eugene O. Gehl* and *Brynelson, Herrick, Gehl & Bucaida,* Madison, for Wisconsin Power & Light Company; by *William T. Rieser* and *Stafford, Rosenbaum, Rieser & Hansen,* Madison, for Madison Gas & Electric Company; with oral argument by *Allen W. Williams, Jr.*

For the Public Service Commission of Wisconsin the cause was argued by *Steven M. Schur,* chief counsel, with whom on the brief was *Barry M. Levenson,* assistant chief counsel.

STEINMETZ, J.  The issue in this case is whether the Public Service Commission accounting order of March 2, 1979, in Docket CA–5491, which effectively forced utility shareholders to bear reasonable and prudent expenditures, is arbitrary and capricious.

This action is a petition for review under sec. 227.15, Stats.,[1] of a Public Service Commission (PSC) order.

---

[1] Sec. 227.15., Stats., provides:

"227.15 **Judicial review; orders reviewable.** Administrative decisions which adversely affect the substantial interests of any per-

It arose out of an application filed with the PSC on July 10, 1974, by Wisconsin Public Service Corporation (WPS), Madison Gas and Electric Company (MG&E), Wisconsin Electric Power Company (WEPCO), and Wisconsin Power & Light Company (WP&L) (collectively the Joint Applicants) for a certificate of authority to construct a power plant in the Town of Koshkonong in Jefferson County. By order dated October 18, 1974, the PSC dissolved a restraining order and authorized the Joint Applicants to make expenditures necessary to process their application.

In July, 1977, the Joint Applicants requested that the application be withdrawn. The PSC kept the docket open to determine the proper accounting treatment for the expenditures incurred in planning for the plant and pursuing the certificate of authority (the precertification expenditures). On March 2, 1979, the PSC issued its order in Docket CA–5491 (hereinafter the accounting order) directing the accounting treatment to be given the $33,881,244.86 of Koshkonong precertification expenditures.

Except for approximately $45,000 of advertising expenses, the accounting order found all of the accumulated precertification expenditures reasonable and prudent. The portion of the accounting order at issue directed the Joint Applicants to reclassify $7,526,324.66 of those expenses as Extraordinary Property Losses, and to amortize that amount in 12 equal monthly installments beginning retroactively on January 1, 1979.

son, whether by action or inaction, whether affirmative or negative in form, except the decisions of the department of revenue, the commissioner of banking, the commissioner of credit unions, the commissioner of savings and loan, and the state board of vocational, technical and adult education acting under s. 38.29, and as otherwise provided by law, shall be subject to judicial review as provided in this chapter."

In effect, the PSC order treated the $7.5 million expenditure in such manner that there was never any possibility that it could be recovered from ratepayers.[2]

WPS filed a petition for review of the accounting order with the circuit court for Brown County. On October 15, 1979, circuit court Judge Robert J. Parins issued a decision reversing and remanding the accounting order. An order implementing the decision was entered on November 15, 1979, after which the PSC brought an appeal to the court of appeals.

On December 22, 1981, the court of appeals reversed the decision of the circuit court. A petition for review

[2] The PSC does not guarantee the amount of revenue a utility will generate nor the rate of return it will earn for its shareholders. Rather, the PSC sets rates which give the utility the opportunity to earn the authorized rate of return. In setting rates the PSC first projects the utility's operating expenses (costs) for a "test year," and then adds to that the amount necessary to pay a reasonable rate of return. The total figure is the "revenue requirement." The PSC then devises a rate structure which, based on projected sales, will enable the utility to collect from the various classes of customers sufficient income to meet the revenue requirement.

Costs, whether operating costs or accounting write-offs, can only be recovered from ratepayers if they have been incorporated in approved rates. To the extent costs are not included in, or exceed, test year projections, they must be absorbed by the shareholders through reduced earnings per share. The retroactive amortization of the $7.5 million precertification expenditure prevented the Joint Applicants from including these costs in the test years of their rate cases, precluding the recovery of the expenses from their ratepayers.

The accounting order also directed that of the remaining Koshkonong precertification expenses, $19,749,091.38 be transferred to the Haven project; $3,280,300 be reclassified to nuclear fuel in process of refinement conversion, enrichment and fabrication account; and $3,280,300 be retained in miscellaneous deferred debts account. Unlike the accounting treatment accorded the $7.5 million expenditure at issue, the accounting treatment for the balance of the Koshkonong precertification expenses did not prevent eventual recovery of expenses by the Joint Applicants in future rates.

filed on behalf of the Joint Applicants was granted by this court on March 15, 1982.

The commission found the expenditures to be of a prudent nature necessarily incurred in planning for the Koshkonong project. The commission further found that a large portion of such expenditures were to be transferred to the proposed Haven project,[3] but that other expenditures were not to be transferred to the Haven project for the reason that such expenditures were of no value either to the public utilities involved or their customers.

The commission determined in its findings that the approximate effect of the accounting action taken upon the earnings per share of the various public utilities would range from four cents to thirteen cents per share to the stockholders.

The trial court reasoned that since the commission found that the expenditures were prudently made, the expenditures should have been amortized over a period of time that would enable the expenses to be reflected in future rates. The court of appeals disagreed and reversed. The court of appeals also stated: "We concur with the circuit court that the policy reasons stated in the Order are sound. In light of the policy reasons supporting the PSC's exercise of discretion, the Order should not be reversed or remanded because it is inconsistent with prior agency practice." Contrary to this statement the trial court did not find the policy reasons sound but rather stated: "However, this court is also satisfied that the policy reasons given for an early write-off of these expenditures as it may affect the rate payers and stockholders must give way to the finding that the expenditures were prudently made and were not to be charged to the stockholders."

---

[3] The Haven project was also later abandoned.

There were essentially three policy reasons offered by the commission to support the accounting order:

(1) The expenditures on the books have no value to the stockholders or ratepayers, and represent a potential problem for future investors, so they should be eliminated from the companies' books as quickly as possible. Specifically, the order stated: "First of all, the dollar amounts remaining on the books not only have no value to the stockholders or the ratepayers but also represent a potential problem for future investors. The sooner they are eliminated from the companies' books the better from a financial standpoint."

The commission did not state what the "potential problem" was. How the utilities are benefited "from a financial standpoint" when they are precluded from recovering $7.5 million from the ratepayers is unexplained and lacks reasoned judgment. If anything, investors would likely hesitate to invest in a company which was forced to sustain such a financial loss. Where expenditures are prudent, investors should be able to anticipate that all such costs will eventually be recovered from ratepayers. If investors are never certain whether the PSC will effectively charge a prudent precertification expenditure to shareholders or ratepayers, such uncertainty provides a disincentive for investors.

(2) The quick write-off minimizes adverse effects on the stockholders and ratepayers without burdening either. Specifically, the order stated: "Secondly, the quick write off method minimizes adverse effects on both the stockholders and the ratepayers without constituting an undue burden on either." There is no logic in that statement since the write-off certainly did minimize the adverse effects on the ratepayers; in fact, there was no negative effect. But the write-off maximized the burden on shareholders. Even if the write-off does yield tax advantages for shareholders, it still remains true that

the shareholders are bearing the entire cost of the expenditures.

(3) The PSC anticipated changing its policy and treating precertification expenditures as operating expenses. That change in policy combined with long-term amortization of the Koshkonong expenditures would be a "significant additional burden to ratepayers." Specifically, the order stated:

"Finally, it appears likely that further write-off of significant amounts remaining on the books will be required in the near future because the commission is in the process of re-examining its current policy with respect to financial treatment of pre-certification expenditures and construction work in progress. In order to prevent the accumulation of amounts such as these in the future and to better control the reasonableness of such expenditures, the commission may decide to require that more of the costs of planning and applying for new construction be expensed currently rather than added to the rate base of the companies. Such a policy change would have the effect of increasing customer rates in the short-run, although bringing about significant long-term savings to customers.

"Longer-term amortization of Koshkonong losses would add a significant additional burden to ratepayers if it was [sic] done in conjunction with such changes in accounting treatment, and might prevent the commission from moving quickly to ultimately relieve the pre-certification expenditures problems typified in this proceeding."

The PSC is in effect stating that since such expenditures were capitalized in the past (allowing for recovery from ratepayers) and are likely to be expensed in the future (still allowing recovery from ratepayers), it will treat this expenditure in a manner that precludes any recovery from ratepayers. The PSC advances no reason why utility shareholders should bear the adverse consequences of a change in PSC accounting policy.

This accounting order was, as the court of appeals found, to be "an express deviation from the past practice, which capitalized such expenses in the cost of completed projects, and is different from the expressly anticipated policy of treating precertification expenditures as operating expenses." The court of appeals then found the deviation adequately explained in the commission's policy reasons. We disagree with the court of appeals and find the reasons given by the commission to be without substance or convincing power. Sec. 227.20(8), Stats., requires that deviation from prior agency practice be "explained to the satisfaction of the court by the agency." While this court has recognized that inconsistencies in determinations arising by comparison are not proof of arbitrariness or capriciousness, if the deviation is so unreasonable as to be without a rational basis or the result of an unconsidered, willful and irrational choice of conduct, the decision is an arbitrary and capricious one. *Robertson Transport Co. v. Public Serv. Comm.*, 39 Wis. 2d 653, 159 N.W.2d 636 (1968) ; *Olson v. Rothwell*, 28 Wis. 2d 233, 137 N.W.2d 86 (1965). Agencies are not free to shift between decisions without a rational basis.

In *West Ohio Gas Co. v. Comm'n. (No. 1)*, 294 U.S. 63, 72 (1935), the United States Supreme Court stated that, "development expenses to foster normal growth are legitimate charges upon income for rate purposes as for others." In this case, there is no dispute that the precertification expenditures were prudent. Utilities have a statutory duty to engage in such expenditures. Sec. 196.03(1), Stats., states: "Every public utility is required to furnish reasonably adequate service and facilities." It is arbitrary and capricious to authorize a utility to expand its facilities, spend large amounts of money prudently to accomplish that goal, and then force the utility to bear the entire risk of such expenditures.

*Transcontinental Gas Pipe Line Corp. v. F.P.C.*, 518 F.2d 459 (D.C. Cir. 1975), on which the court of appeals relied, was misapplied. In *Transcontinental*, the court approved a Federal Power Commission accounting order. However, that order permitted the recovery in rates of advance payments made by gas pipeline companies to gas producers to finance gas exploration and development. Transco argued that it was also entitled to earn a return on the capital cost for making the payments. This, the court held, the FPC could deny in the order since Transco was in fact recovering the advance payments. Implicit in the *Transco* decision is that prudent expenditures are recoverable, since the utility did, in fact, recover the full amount of its advance payments.

Not only is the PSC's accounting order inconsistent with its practice in other dockets, it is also inconsistent with a previous order in the Koshkonong docket itself. On October 18, 1974, five years before the accounting order in issue, the PSC authorized the Joint Applicants to make these precertification expenditures and established two conditions that had to occur before the Koshkonong precertification expenditures could be charged to shareholders:

(1) the requested approvals (certificate of authority) must not be granted; and

(2) the expenditures must be found to be "improvident."

Thus, in 1974, the PSC established that the expenditures would not be charged to shareholders unless they were found to be improvident. In the 1979 order, the PSC found the expenditures "prudently made."[4] Yet,

---

[4] Webster's Third New International Dictionary (1967) defines "prudent" as marked by wisdom or judiciousness, provident, or frugal. "Improvident" is defined as lacking foresight, negligent, or thriftless. For purposes of this decision, expenditures found to be "prudently made" are not "improvident."

despite the 1974 order, the accounting order effectively charged those prudent expenditures to the shareholders. The accounting order changed the PSC's own position it established in 1974 (before the expenditures were made) for recovery of the Koshkonong precertification expenditures.

In *Milwaukee & S.T. Corp. v. Public Service Comm.,* 268 Wis. 573, 586, 68 N.W.2d 552 (1955), appeal dismissed 350 U.S. 877 (1955), the corporation challenged the commission's method of computing allowable depreciation. The court upheld the PSC's methodology and stated:

"The commission has a considerable latitude in matters of policy in regulating utilities and public transportation systems, because such questions of policy are generally the function of the commission and not the courts. Therefore, whatever accounting method the commission employs in computing allowable depreciation in a rate or fare case will not be disturbed upon judicial review unless it in itself results in producing rates or fares that are unjust or unreasonable."

Since the commission's accounting treatment prevented the recovery of $7.5 million from ratepayers, future rates would necessarily be unjust and unreasonable. In conclusion, we find the commission's decision to be arbitrary and capricious because it lacked a rational basis and was not based on sound policy reasons. We do not have before us and we do not decide the issue of whether prudent expenditures are always recoverable from ratepayers.

*By the Court.*—The decision of the court of appeals is reversed.